IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VANCE CAMPBELL,<br><br>Defendant. | 8:19CR324<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on Defendant Vance Campbell's Motion to Suppress. (Filing No. 53.) Evidentiary hearings regarding the motion were held on March 9, 2021 and April 7, 2021. Transcripts of the hearings have been filed and this matter is now ripe for disposition.

For the reasons explained below, the undersigned will recommend that Defendant's Motion to Suppress be granted, in part, and denied, in part.

**FACTS**

On September 24, 2019, at approximately 1:30 p.m., Omaha Police Officer Jeffrey Vaughn ("Officer Vaughn") was patrolling near 24th and Leavenworth Street in Omaha, Nebraska. (TR. 6; TR. 7.) Officer Vaughn is assigned to the Omaha K-9 Unit. (TR. 4.) He is also part the interdiction squad. (TR. 4.) His primary duties are to work on the interstates conducting traffic enforcement and to provide support for narcotics investigations to various units and agencies in the metro area. (TR. 4.) Officer Vaughn assists with K-9 sniffs, traffic stops, search warrants, and various types of investigations related to narcotics activity. (TR. 5.)

While on patrol on September 24, 2019, Officer Vaughn was contacted on a police-issued cell phone by Detective Robert Branch, Jr. ("Detective Branch"). (TR. 5; TR 21). Detective Branch is a detective with the Omaha Police Department Narcotics Unit. (TR. 51; TR. 52.) Detective Branch has been with the Omaha Police Department for seventeen years. (TR. 52.) Officer Vaughn testified Detective Branch wanted to know whether Officer Vaughn was available to assist him with an investigation. (TR. 5.) Officer Vaughn testified Detective Branch told him

the Narcotics Unit was investigating an individual named Vance Campbell (Defendant). (TR. 7.) Officer Vaughn testified it was his understanding that the Narcotics Unit was following Campbell at the time he was contacted by Detective Branch. (TR. 7; TR. 19; TR. 33; TR. 45.)

Detective Branch testified he observed Defendant leave the garage of an apartment near 24th and Leavenworth and then contacted Officer Vaughn and other officers of the Narcotics Unit. (TR. 53; TR. 68.) Detective Branch testified the Narcotics Unit had been surveilling Defendant since mid-August, 2019. (TR. 64.) Detective Branch stated he identified Defendant around August 19, 2019 and confirmed Defendant had a warrant at that time. (TR. 64; TR. 27.)

When he contacted Officer Vaughn, Detective Branch told him that Vance Campbell (Defendant) was in the area of 24th and Leavenworth. (TR. 17.) Detective Branch also told Officer Vaughn Defendant's date of birth and reported that Defendant was driving a black Ford Explorer. (TR. 7; TR. 19; TR. 54-55; TR. 71.) Officer Vaughn testified he does not recall whether he was provided a license plate number for the Explorer. (TR. 19.) Officer Branch told Officer Vaughn Defendant had outstanding warrants and they wanted to arrest Defendant if the opportunity presented itself. (TR. 7; TR. 19; TR. 54-55; TR. 71.) Detective Branch also told Officer Vaughn that Defendant was a flight risk and had run from uniform patrol officers recently. (TR. 7; TR. 54-55.) Detective Branch further advised Officer Vaughn that they would like to make contact with Defendant in a way to avoid a vehicle pursuit. (TR. 7.) Officer Vaughn was not provided a physical description of Defendant. (TR. 19.) Officer Vaughn had no knowledge of Defendant prior to that day and had never seen Defendant before. (TR. 19.)

Officer Vaughn then heard another officer over the police radio report that Defendant was in the parking lot of the gas station near 24th and Leavenworth. (TR. 48; TR. 56.) Officer Vaughn then observed Defendant parked in the gas station pumping gas at the back of the Explorer. (TR. 7-8.) Officer Vaughn parked his cruiser behind the Explorer and approached Defendant. (TR. 7-8.) Officer Vaughn testified Defendant did not see him approach. (TR. 8.) Officer Vaughn put Defendant in handcuffs and placed Defendant in the front seat of his cruiser. (TR. 8-9.) Detective Branch testified Officer Vaughn made contact with Defendant within minutes of him calling Officer Vaughn. (TR. 54.)

Officer Vaughn testified that when he made contact with Defendant, Defendant identified himself as Vance Campbell. (TR. 10.) Defendant also told Officer Vaughn the Explorer was not his vehicle.[1] (TR. 25.) Officer Vaughn testified he conducted a pat down search of Defendant and located a baggy of marijuana in Defendant's front right pocket. (TR. 9.) However, Officer Vaughn is unsure when he conducted the pat down search of Defendant and found the marijuana. (TR. 9.) The initial encounter between Defendant and Officer Vaughn was not recorded because Officer Vaughn did not have a body camera. (TR. 28.) The conversation between Officer Vaughn and Defendant was recorded when Defendant was placed in the cruiser. (TR. 22; Ex. 1.)

When Officer Vaughn was buckling Defendant into his seat, he asked Defendant if he knew what his warrant was for. (Ex. 1.) Officer Vaughn testified that while Defendant was in the cruiser, he conducted a records check and confirmed Defendant had warrants through Iowa and Sarpy County. (TR. 10; TR. 25.) As he was waiting for the records checks to come back, Officer Vaughn deployed his K-9, Nacho, to conduct a free air sniff of the Explorer. (TR. 10; TR. 11.) At the time, Nacho was a certified drug dog through the Nebraska Law Enforcement Training Center. (TR. 42.) Officer Vaughn began the sniff at the front passenger side of the vehicle and walked Nacho in a counterclockwise direction. (TR. 11.) As Nacho neared the driver door, he began to alert and then indicated the odor of drugs. (TR. 11.) Nacho is a passive dog so he will sit, lay or stare for his final indication. (TR. 11.) Nacho lied down at the driver door to give his final positive indication. (TR. 11.) According to Officer Vaughn's testimony, he had no idea how long it took Nacho to conduct the sniff and return to the cruiser but estimated 30 seconds.[2] (TR. 27-28.) The indication was not captured on camera because Officer Vaughn did not have a body camera. (TR. 28.)

---

[1] Detective Branch testified the Explorer was registered to Richard Huff. (TR. 64.) Detective Branch testified he did some research and learned Richard Huff was a known alias for Defendant. (TR. 64.) It was later determined that Richard Huff is Defendant's brother. (TR. 83.) A subsequent evidentiary hearing was held regarding the identity and description of Richard Huff. At that time, mug shots of Richard Huff and Defendant were presented to the Court. (Ex. 103.) Upon reviewing the photographs, the undersigned finds the men do not look similar enough for officers to mistake one for the other based on appearance.

[2] Defendant argued during closing argument that it took 21 seconds. The video shows approximately 24 seconds elapsed from the time the door is shut removing the dog from the cruiser to when the door was opened to put the dog back in the cruiser. (Ex. 1.)

Following the positive indication, Officer Vaughn came back to the Explorer and told Defendant that his dog indicated to the odor of drugs coming from the vehicle and asked Defendant if there would be any reason for that. Defendant said, "I'm not sure, sir." (Ex.1.) After this conversation Officer Vaughn started to search the Explorer. (TR. 11.) Officer Vaughn testified that while he was searching the Explorer, Defendant unbuckled his seatbelt. (Ex. 1; TR. 12.) Officer Vaughn saw this and went back to the cruiser with his gun drawn and buckled Defendant back in stating to Defendant, "ok we will do this a different way then". (Ex. 1.) Officer Vaughn then closed the cruiser door and waited right outside of it. (Ex.1.) While Officer Vaughn was waiting outside the door, Defendant's criminal record checks came back indicating he had a warrant out of Sarpy County and a warrant out of Iowa. (Ex.1.) Defendant was able to hear the record check come back on the radio while he was in the cruiser. (Ex. 1.) After the warrants came back, Officer Vaughn opened the cruiser door and asked Defendant if he was going to run when there is a dog in the back. (Ex. 1.) Defendant responded by telling Officer Vaughn he was not going to run. Officer Vaughn responded to Defendant saying something to the effect of, that was what you wanted to do.[3] (Ex. 1.) Defendant responded by saying there was dope in the Explorer and the dope was his. (Ex. 1; TR. 13.) Officer Vaughn then asked Defendant how much dope was in the car. (Ex. 1.) Defendant responded that there was ½ pound. (Ex. 1.) Officer Vaughn found about 231 grams of methamphetamine in the front driver seat. (TR. 12.) There was also some currency located in the center console. (TR. 12.)

Officer Vaughn testified that at some point after he made contact with Defendant, Officer Ryan Davis and Officer Tony Desanti arrived on the scene. (TR. 17.) Once the drugs were located, Defendant was transferred to Officer Davis's cruiser and taken to police headquarters. (TR. 17.) At no point during his encounter with Defendant did Officer Vaughn provide Defendant a *Miranda* advisement. (TR. 13.)

Once Defendant arrived at police headquarters, he was interviewed by Detective Branch. (TR. 56 Ex. 1.) The interview was recorded and later transcribed. (Ex. 1; Ex. 101.) Before providing Defendant with a *Miranda* advisement, Detective Branch started explaining to Defendant that individuals in situations such as Defendant could help themselves. (Ex. 1; Ex.

---

[3] It is hard to hear exactly what Officer Vaughn says to Defendant at this point in the video due to talking coming over the radio in the car at the same time.

101.) Detective Branch said to Defendant: "Lots going on, and there's certain things people can do to help themselves. And there's a difference between serving a substantial amount of time in prison or having that time reduced, but the majority of time that happens with some type of cooperation." (Ex. 1; Ex. 101, pgs. 3-4.) Detective Branch then began telling Defendant about his knowledge of Defendant's drug activities. (Ex. 101.) Detective Branch explained to Defendant that he was not asking questions but was just talking to him. (Ex. 1; Ex. 101, pg. 8.) Detective Branch then told Defendant: "And if you help us, then we will help you. And it may not be immediate; you do have a warrant, okay, through Sarpy County. So, with helping us, it may come on down the road; you could get a reduction in time for assisting us with getting a larger amount of dope." (Ex. 1; Ex. 101, pg. 9.) Defendant then denied knowing the location of additional drugs. (Ex. 1; Ex. 101, pg. 9.) Detective Branch and Defendant began discussing Defendant's warrants because Defendant not only had a misdemeanor warrant out of Sarpy County, he also had a felony warrant out of Iowa. (Ex. 1; Ex. 101, pg. 13.) Detective Branch told Defendant he was not making him any promises or guarantees but explained that cooperating could potentially reduce the amount of prison time Defendant would get. (Ex. 1; Ex. 101, pg. 13.)

During the pre-*Miranda* conversation, Defendant also asked to call his girlfriend, who was eventually identified as Rebecca Pick ("Ms. Pick"). Detective Branch asked Defendant some questions about her, such as her name and where she was located. (Ex. 101, pg. 15.) Defendant asked Detective Branch: "Why would you be so concerned about my girlfriend, bro? Trying to use her as leverage against me to get me to cooperate?" (Ex. 101, pg. 16.) Branch responded by telling Defendant: "Vance, it's your ass on the line." (Ex. 101, pg. 16.) Defendant was then provided a *Miranda* advisement. (Ex. 101, pgs. 17-18.) Detective Branch testified he was not trying to elicit an admission by questioning Defendant prior to providing Defendant his *Miranda* rights. (TR. 62.) He explained to Defendant why they were there and why he was under arrest. (TR. 62.)

Detective Branch advised Defendant of his *Miranda* rights. (Ex. 1; Ex. 101, pgs. 17-18.) When Detective Branch asked Defendant "knowing your rights in this matter, are you willing to talk to me now," Defendant, without answering Detective Branch's questions, started speaking and indicated he had no idea what Detective Branch wanted to talk to him about. (Ex. 1; Ex. 101, pg. 18.) Detective Branch listened to Defendant and then asked again "knowing your rights in this matter, are you willing to talk to me now." (Ex. 1; Ex. 101, pg. 19.) Defendant did not answer,

5

and Detective Branch then started explaining to Defendant that sometimes in these situations time is of the essence. (Ex. 1; Ex. 101, pg. 19.) Detective Branch also mentioned Ms. Pick, stating "hypothetically speaking, okay, sometimes we hit a location, and I know you're concerned about your girlfriend and stuff, when we hit the location, you know, sometimes multiple people get charged with the dope that we find there or whatever we find there." (Ex. 1; Ex. 101, pg. 19.) Detective Branch also explained that sometimes people take responsibility for that stuff and maybe that is where Defendant's concern lied. (Ex. 1; Ex. 101, pg. 20.)

Detective Branch continued by explaining: "So just because we hit a place, we go somewhere, not everybody gets arrested." (Ex. 101, pg. 20.) Defendant asked, "what place are you talking about?" (Ex. 1; Ex. 101, pg. 20.) Detective Branch indicated whatever place it may be, he did not know and reminded Defendant he was only speaking hypothetically. (Ex. 1; Ex. 101, pg. 20.) Detective Branch also told Defendant he knew Defendant was not going to smoke the dope he had, that it was going somewhere. (Ex. 1; Ex. 101, pg. 20.) Defendant then asked Detective Branch what he wanted from him. (Ex. 1; Ex. 101, pg. 20.) Detective Branch told Defendant he wanted to get through the last question, and then asked Defendant "knowing your rights in this matter, are you willing to talk to me now?" (Ex. 1; Ex. 101, pg. 21.) Defendant did not answer the question but said "Talk to you about what?" (Ex. 1; Ex. 101, pg. 21.) Detective Branch stated: "about drugs." (Ex. 1; Ex. 101, pg. 21.) Defendant then said: "About drugs; you found some drugs on me. What else do you want to know?" (Ex. 1; Ex. 101, pg. 21.) Detective Branch said "if you answer the question, then I'll . . . " at this point, Defendant said yes, waiving his *Miranda* rights. (Ex. 1; Ex. 101, pg. 21.)

Once Defendant agreed to speak to Detective Branch, they discussed Defendant's knowledge of drug activity. (Ex. 1; Ex. 101.) Detective Branch asked Defendant where drugs were located. (Ex. 1; Ex. 101, pg. 31.) Defendant indicated he would not provide that information. (Ex. 1; Ex. 101, pgs. 31-32.) Detective Branch then told Defendant: "Well, Vance, you got to think of the big picture here. What if I already knew where they were because I've been following you? (Ex. 1; Ex. 101, pg. 32.) Detective Branch explained: "So what if we're in the process of getting those 16 pounds right now? You either want credit for it, you want to be of assistance, or do you want to sit there and say I'll take my chances, good luck to you?" (Ex. 1; Ex. 101, pg. 32.)

6

Defendant then provided Detective Branch the general location of some drugs. (Ex. 1; Ex. 101, pgs. 32-33.) Following some discussion, Defendant stated: "What am I gonna get?" (Ex. 1; Ex. 101, pg. 33.) Detective Branch responded: "I'm not going sit here and make you any promises or guarantees." (Ex. 1; Ex. 101, pg. 33.)

Then, Detective Branch and Defendant began discussing transporting Defendant to the place where the drugs were located. (Ex. 1; Ex. 101, pg. 33.) Defendant told Detective Branch he was not going to walk into the place where the drugs were located in handcuffs. (Ex. 1; Ex. 101, pg. 34.) Defendant confirmed that the place where the drugs were located was an apartment that belonged to his friend. (Ex. 1; Ex. 101, pgs. 36, 38.) Defendant also stated that nobody lived in the apartment. (Ex. 1; Ex. 101, pg. 35.)

Branch then gave Defendant an Omaha Police Department Permission to Search Form. (Ex. 1; Ex. 101.) Before signing it, Defendant asked: "Who are you gonna charge for this? (Ex. 1; Ex. 101, pg. 41.) Defendant stated he was not going to take Detective Branch to the location of the drugs and then be charged with possessing the drugs. (Ex. 1; Ex. 101, pg. 41.) Detective Branch told Defendant: "Well, here's just the deal just because we recover that dope doesn't necessarily mean that you're going to be charged for it." (Ex. 1; Ex. 101, pg. 41.) Branch then explained if Defendant did not give consent to search, he would get a warrant to search the property. (Ex. 101, pgs. 43-44.) Defendant questioned how Detective Branch would get a warrant because the officers did not know whose name the apartment was in. (Ex. 101, pgs. 43-44.) Branch stated: "It's up to you, all right? Nobody threatening you. And I told you there's a possibility that you may be charged with it. There's a possibility you might not." (Ex. 101, pgs. 43-44.)

Defendant again told Detective Branch he was not going to give permission to search if he was going to be charged. (Ex. 1; Ex. 101, pg. 44.) Detective Branch reiterated he was not making Defendant any promises. (Ex. 1; Ex. 101, pg. 46.) Again, Defendant refused to give permission to search without being told he was not going to be charged. (Ex. 1; Ex. 101, pg. 49.) Detective Branch then again told Defendant he could not promise or guarantee Defendant he would not be charged. (Ex. 101, pg. 50.) Defendant then refused to give consent to search. (Ex. 1; Ex. 101, pg. 51.) Detective Branch explained: "I'm not trying to coerce you, I'm not trying to play games with

7

you, okay?" and stated he could not make Defendant any guarantees. (Ex. 1; Ex. 101, pgs. 52-53.) After a little more discussion, Defendant provided consent to search. (Ex. 1; Ex. 101, pg. 54.)

Officer Branch testified that they then went to the apartment where the drugs were stored. (TR. 61.) They used Defendant's key to get in, and Defendant pointed out where 20-plus pounds of methamphetamine was located throughout the apartment. (TR. 61.)

Detective Branch testified he has conducted hundreds of interviews throughout his career. (TR. 58.) Detective Branch testified it was difficult to interview Defendant because Defendant was agitated. (TR. 58.) Detective Branch stated he personally was cordial and calm during the interview and that he did not yell or make any threats or promises. (TR. 77.) Detective Branch testified Defendant was a middle-aged male who seemed to be somewhat educated. (TR. 59.) Detective Branch stated Defendant did not appear to be intoxicated. (TR. 59.) Defendant stated during the interview that he last used drugs three or four days before the interview. (Ex. 101.)

**DISCUSSION**

Defendant argues all physical evidence and statements he made as a result of his detention and arrest should be suppressed because (1) he was detained without reasonable suspicion, (2) the warrantless search of the Explorer was unconstitutional, (3) his statements to Officer Vaughn while in the cruiser occurred while he was in custody and without being advised of his *Miranda* rights, and (4) his statement to Detective Branch were the product of explicit and implicit promises of leniency and Detective Branch's plan to circumvent *Miranda*. Having considered the arguments, the Court finds as set out below.

1.  **Detention**

Law enforcement "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) (quotation omitted). Reasonable suspicion "requires less than probable cause of criminal activity, but the suspicion cannot be based on an inarticulate hunch." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010). "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances,

8

taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *Id*. In assessing whether the requisite degree of suspicion exists, a court must determine "whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988).

In justifying an investigative detention, "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation." *United States v. Ortiz–Monroy*, 332 F.3d 525, 529 (8th Cir. 2003). *See also United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018) (stating that "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication") (quotation omitted). Further, an officer may become a member of an investigation team when he is instructed to conduct a traffic stop even if he does not possess "all the relevant collective knowledge of the team." *United States v. Robinson,* 664 F.3d 701, 704 (8th Cir. 2011).

At the time Officer Vaughn approached and detained Defendant, he knew from information received from other officers that the Narcotics Unit was investigating and following an individual named Vance Campbell. Detective Branch, a seventeen-year veteran with the Omaha Police Department, told Officer Vaughn that Vance Campbell was driving a black Explorer in the area of 24th and Leavenworth. Detective Branch also told Officer Vaughn that Vance Campbell had outstanding warrants and was a flight risk.[4] Officer Vaughn also learned from the police radio that Vance Campbell was at a gas station near 24th and Leavenworth. When Officer Vaughn arrived at the gas station, he observed an individual at the back of a black Explorer. Officer Vaughn

---

[4] Defendant initially argued that at the time Officer Vaughn approached him, Officer Vaughn did not know his identity or whether he had a warrant. At the first evidentiary hearing, Defendant questioned whether the officers truly knew whether he had a warrant at the time he was handcuffed by Officer Vaughn. Therefore, the Court granted Defendant's motion to compel information regarding searches of Defendant's name through government computer systems from August 1, 2019 through September 24, 2019. (Filing No. 73.) At the second evidentiary hearing, Defendant acknowledged that, based on the information received from the government, Detective Branch had looked-up Defendant in NCIS and verified he had a warrant. (TR2.) Therefore, Defendant acknowledged officers knew Defendant had a warrant on the day he was approached by Officer Vaughn. (TR. 2.)

approached Defendant and placed him in handcuffs. Defendant identified himself as Vance Campbell. Although Officer Vaughn did not have a physical description of Defendant and had no knowledge of Defendant prior to that day, the collective knowledge and experience of all the officers involved shows there was reasonable suspicion for Defendant's detention under the totality of the circumstances.

### 2. Search of the Explorer

The warrantless search of the Explorer did not violate Defendant's Fourth Amendment rights. It is well-established that use of a drug detection dog during a lawful stop "generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Thus, as long as a stop is not extended in order for officers to conduct a dog sniff of a vehicle, the sniff is lawful. See *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016). See also *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007) ("When a traffic stop is lawful at its inception and otherwise executed in a reasonable manner, a dog sniff conducted during the stop does not infringe on a constitutionally protected privacy interest.").

Here, the stop/detention was not extended to obtain the dog sniff of the Explorer. While conducting the records check, Officer Vaughn deployed his K-9, Nacho, to conduct a free air sniff of the Explorer. Once deployed, Nacho almost immediately alerted and indicated to the smell of narcotics. It took Nacho approximately 24 seconds to conduct the sniff and return to Officer Vaughn's cruiser. Once Nacho alerted and indicated, Officer Vaughn had probable cause to search the Explorer because "[a] dog's positive indication [to the odor of narcotics] is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). To establish the dog's reliability, the evidence need only show the dog was trained and certified to detect drugs. *Id*. The record shows that Nacho was a trained and certified drug dog at the time of the search. Therefore, Officer Vaughn's warrantless search of the Explorer was supported by probable cause and the search did not violate Defendant's constitutional rights.

### 3. Statements

Under *Miranda v. Arizona,* 384 U.S. 436, 484 (1966), certain warnings must be given anytime a suspect is in custody and subject to interrogation by law enforcement officials. *United States v. Elzahabi,* 557 F.3d 879, 883 (8th Cir.2009). Interrogation occurs when an officer's interaction with the suspect is "likely to elicit an incriminating response." *Rhode Island v.. Innis,* 446 U.S. 291, 301 (1980). "Interrogation includes not only express questioning by an officer, but also any words or actions that police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Ochoa–Gonzalez,* 598 F.3d 1033, 1038 (8th Cir. 2010) (internal quotation omitted). The proper standard for determining whether a question is "reasonably likely to elicit an incriminating response from the suspect" is an objective one that "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis,* 446 U.S. at 301. "This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Innis,* 446 U.S. at 301 n.7.

In determining whether a suspect is "in custody" for purposes of *Miranda*, courts "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." *United States v. Griffin,* 922 F.2d 1343, 1347 (8th Cir.1990) (quotation omitted). Whether a defendant was '"in custody' is an objective inquiry." *J.D.B. v. North Carolina,* 564 U.S. 261, 270 (2011). It "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994). A suspect is in custody if a reasonable person in his position would not have felt free to terminate the interrogation and leave. *United States v. Cowan,* 674 F.3d 947 (8th Cir. 2012). Indicia of custody include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether

11

the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. Other relevant factors may include the time, place, and length of the interview and the suspect's age, education, intelligence, work history, and prior experience with law enforcement. *See United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016).

### A.   Statements to Officer Vaughn

#### i.   Custody

Defendant contends in his brief that the statements he made in Officer Vaughn's cruiser should be suppressed because he was in custody and Officer Vaughn did not provide a *Miranda* advisement. As to the issue of custody, the record shows Officer Vaughn immediately handcuffed Defendant and told Defendant he had a warrant. Officer Vaughn then placed Defendant in the front seat of his cruiser[5] obtained his name, date of birth, social security number, height and weight, and then buckled Defendant's seat belt.[6]

Having considered the factors set out in *Griffin*, the Court finds Defendant was in custody at the time he was questioned by officer Vaughn. Defendant did not initiate contact with the police and did not possess freedom of movement. When Officer Vaughn made contact with Defendant, Defendant was immediately placed in handcuffs and seat belted into the cruiser. Moreover, Defendant was not told that he did not have to respond to Officer Vaughn's questions, that questioning was voluntary, that he could leave at any time, or was not under arrest. Although Officer Vaughn did not use strong arm tactics or deceptive strategies during questioning, the atmosphere was somewhat police dominated. When Defendant unbuckled his seat belt and attempted to get out of the cruiser, Officer Vaughn pulled out his firearm, pointed it at Defendant, and then re-buckled him into the cruiser. Under the totality of the circumstances, a reasonable

---

[5] Officer Vaughn had a drug dog that was in the back seat, so it appears from the video that the only place to put Defendant was in the front seat of his cruiser. (Ex. 1.) However, this was not fully developed on the record.

[6] "[A] request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985).

12

person in Defendant's position would have understood his situation to be one of custody and would not have felt free to terminate the encounter.

### ii. Interrogation

The questions Officer Vaughn asked Defendant amounted to an interrogation. After Officer Vaughn's dog indicated on the Explorer, Officer Vaughn returned to his cruiser and told Defendant the K-9 had indicated to an odor of drugs coming from the Explorer. Officer Vaughn then asked Defendant if there was any reason why the K-9 would be indicating. Defendant responded by saying, "I'm not sure, sir." The Court finds this question amounted to interrogation because it was a direct question from the officer, and it was likely to provoke an incriminating response. This question may be permissible in a noncustodial situation, such as an ordinary traffic stop. However, because Defendant was in custody under the circumstances presented here, as discussed above, the protections of *Miranda* were triggered. Therefore, this statement must be suppressed.

The only other statements Defendant made in response to questions posed to him by Officer Vaughn occurred when Officer Vaughn saw Defendant unbuckle his seat belt and try to open the cruiser door. After Defendant unbuckled his seat belt, Officer Vaughn pulled his gun and re-secured Defendant's seatbelt. Officer Vaughn testified, based on his recollection, that as he was securing Defendant, he made a statement to him not to run and Defendant responded by saying something like "there is dope in the car." However, the video of the encounter, Exhibit 1, does not reflect that this is exactly the sequence of events or what occurred. After Officer Vaughn re-secured Defendant, he told Defendant he would do it a different way and closed the cruiser door. Officer Vaughn then stood outside the cruiser door. A short time later, the records check came back indicating Defendant had a warrant out of Sarpy County and a warrant out of Iowa. Defendant heard the information about his warrants over the radio while in the cruiser. After the check came back, Officer Vaughn opened the cruiser door and had a conversation with Defendant. It was at that point when Defendant stated there was dope in the car. Exhibit 1 reflects that Officer Vaughn did not *tell* Defendant not to run, but rather *asked* him if he was going to run when a dog was in the car. Defendant said he was not going to run. Officer Vaughn then responded to Defendant's statement and Defendant responded by saying there was dope in the car, and it was

his. Officer Vaughn then asked Defendant how much dope was in the car and Defendant responded, saying there was ½ pound.

At the time Officer Vaughn asked Defendant about running, Defendant had already been asked questions regarding the positive indication for drugs on the Explorer by a drug dog. Further, at that point, Defendant had been caught by Officer Vaughn trying to get out of the cruiser when he was searching the Explorer for drugs. Additionally, Defendant was aware his warrants had been confirmed. Defendant was also aware that Officer Vaughn was going to finish searching the Explorer. Officer Vaughn knew at the time he asked Defendant this question that other officers had been following Defendant and he was being investigated by the Narcotics Unit. Officer Vaughn also knew Defendant had warrants and had previously fled from police. Officer Vaughn should have known that questioning Defendant about running could lead to an incriminating response. Therefore, because Defendant was in custody and interrogated by Officer Vaughn, he should have been provided *Miranda* warnings before being asked the above questions by Officer Vaughn. Therefore, these statements should also be suppressed.

### B.  Statements to Detective Branch

As to Defendant's interview at the police station, Defendant contends his statements should be suppressed because Detective Branch implemented a strategy of deliberately withholding *Miranda* warnings until Defendant made incriminating statements.[7] The Eighth Circuit Court of Appeals has held that "when a defendant moves to suppress a post-warning statement that he contends was given as part of a question-first interrogation, the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*." United States v. Ollie, 442 F.3d 1135, 1142-43 (8th Cir. 2006). The key inquiry is "whether the police officer's technique

---

[7] The suppression of Defendant's statements to Officer Vaughn does not automatically render Defendant's statements to Detective Branch at the police station inadmissible. Absent evidence of actual coercion or improper tactics in obtaining an unwarned statement, "the admissibility of any subsequent statement" turns "solely on whether it is knowingly and voluntarily made." Oregon v. Elstad, 470 U.S. 298 (1985). The court finds Defendant was not coerced into making statements to Officer Vaughn. The court also finds that Officer Vaughn did not employ improper tactics to get Defendant's statements. As stated previously, Officer Vaughn's questions would have been completely appropriate in a non-custodial setting. Further, as will be discussed below, Defendant was provided *Miranda* warnings by Detective Branch and Defendant's statements to Detective Branch were made knowingly and voluntarily.

14

was a 'designed,' 'deliberate,' 'intentional,' or 'calculated' circumvention of *Miranda*." *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005).

In this case, the record does not support Defendant's contention that Detective Branch used a two-step interrogation technique to bypass *Miranda*. During the pre-*Miranda* conversation with Defendant, Detective Branch explained that people can help themselves by cooperating with law enforcement. He also informed Defendant he could potentially get a reduction in time for assisting law enforcement. However, Detective Branch told Defendant he was not making any promises or guarantees. Detective Branch also informed Defendant he was not asking him any questions and was just explaining the situation to him.

Detective Branch testified he was not trying to elicit incriminating responses from Defendant during the pre-*Miranda* conversation. The Court finds Detective Branch credible and his testimony supported by the record. Read in its entirety, the transcript of the conversation between Detective Branch and Defendant does not support the conclusion that Detective Branch had a sinister motive or was trying to obtain incriminating responses. In fact, Defendant did not even admit to Detective Branch during the pre-*Miranda* conversation that he knew the location of additional drugs. Under the totality of the circumstances, the undersigned does not find Defendant's statements must be suppressed as part of a designed, deliberate, intentional, or calculated attempt by Detective Branch to circumvent *Miranda*.

Defendant also argues he did not voluntarily waive his *Miranda* rights and that his statements were coerced and only made upon promises of leniency. "A defendant's waiver of his *Miranda* rights must be made voluntarily, knowingly, and intelligently." *United States v. Duran*, 109 F. Supp.3d 1093, 1102 (D. Minn. 2015). In evaluating whether a waiver was made voluntarily, knowingly, and intelligently, courts examine (1) whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception and (2) whether the suspect waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*.

Further, "[i]n considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was

8:19-cr-00324-JFB-SMB   Doc # 86   Filed: 05/13/21   Page 16 of 18 - Page ID # 291

critically impaired." *United States v. Pierce,* 152 F.3d 808, 812 (8th Cir.1998). In assessing voluntariness, courts look at the totality of the circumstances, including not only the conduct of the police, but also the defendant's ability to resist police pressure. *Id*. In evaluating the totality of the circumstances, courts also consider the defendant's maturity level, education, physical condition, and mental condition. *United States v. Sanchez*, 614 F.3d 876, 883 (8th Cir. 2010).

The totality of the circumstances show Defendant voluntarily waived his *Miranda* rights and that the statements he made to Detective Branch were voluntary. Detective Branch did not deceive or coerce Defendant into waiving his *Miranda* rights. After being read his rights, but before Defendant waived his *Miranda* rights, Detective Branch and Defendant engaged in conversation. During that period, Defendant asked Detective Branch multiple questions, including what Detective Branch wanted to talk to him about. Detective Branch did not hide the ball. He directly responded to Defendant that he wanted to talk to him about drugs. Throughout this conversation, Detective Branch calmly asked Defendant three times whether Defendant was willing to waive his *Miranda* rights and speak to him. The evidence does not show Defendant was intimidated, coerced, or deceived into waiving his rights. Defendant made a free and deliberate choice and he was aware of the consequences of waiving his rights.

Moreover, there is no evidence that Defendant's statements were involuntary or coerced. Throughout the interview, Detective Branch spoke to Defendant in a conversational tone and did not raise his voice. Detective Branch testified Defendant was a middle-aged male, appeared to be somewhat educated, and did not seem to be under the influence. Defendant himself indicated he was not impaired at the time of the interview. Defendant stated he had not used drugs in three or four days. Defendant's demeanor and behavior during the interview also supports the conclusion that his statements were voluntary. Defendant was agitated and confrontational at times with Detective Branch. Detective Branch testified that based on his experience, Defendant's behavior made him difficult to interview. Further, Defendant has previous experience with the criminal justice system. In fact, he did not immediately waive his *Miranda* rights and was seemingly attempting to obtain a "deal" regarding potential drug charges before agreeing to speak. Defendant also did not have a problem telling Officer Branch no, or that he was not going to do something throughout the interview.

Although Detective Branch stated at certain points during the interview that Defendant would not necessarily get charged with the additional drugs Defendant would take them to, these statements did not amount to promises of leniency to entice Defendant to cooperate. *See United States v. Roberts,* 975 F.3d 709 (8th Cir. 2020) (finding that confronting a defendant with the possibility of federal charges and loss of his children was not a tactic that amounted to improper threats or promises that overbore the defendant's will). At multiple points during the conversation, Detective Branch reiterated he was not making Defendant any promises or guarantees regarding charges or reduction in time. Towards the end of the interview, Detective Branch told Defendant he could not promise or guarantee that Defendant would not get charged for the drugs that he would take Detective Branch to get. Detective Branch told Defendant they would go get the dope and go from there. At this point, Defendant indicated that if Detective Branch could not guarantee he would not be charged with the drugs, he would not take him to the location of the drugs. Detective Branch left the room and when he returned, he told Defendant either you take us there and are on board 100%, or you are not. Detective Branch again told Defendant he could not guarantee or promise Defendant would not get charged for the drugs. Defendant then agreed to sign the consent to search form. The totality of the circumstances shows Defendant's statements were not extracted by threats, violence, or promises, such that his will was overborne and capacity for self-determination critically impaired. Therefore, Defendant's motion to suppress the statements made to Detective Branch will be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Senior United States District Court Judge Joseph F. Bataillon that Defendant's Motion to Suppress (Filing No. 53) be granted, in part, and denied, in part, as set out above.

Dated this 13th day of May, 2021.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.