IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 8:19CR324 |
| vs. | |
| VANCE CAMPBELL, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the Findings and Recommendation (F&R), Filing No. 86, issued by United States Magistrate Judge Susan M. Bazis, recommending that the Motion to Suppress filed by the Defendant Vance Campbell ("Defendant"), Filing No. 53, be granted in part and denied in part. Defendant filed an Objection to the Findings and Recommendation, Filing No. 89, as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a). The government failed to respond to the Objection before the deadline. For the reasons set forth below, the Findings and Recommendation will be adopted, in part, the Objection will be sustained in part, and the Motion to Suppress will be granted in part.

## BACKGROUND

Defendant was charged with conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 846 (Count I), and possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1) (Count II). Neither party objected to the Magistrate Judge's factual findings, Filing No. 83 at 1-8. The Court adopts the Magistrate Judge's findings and provides the following summary of the facts relevant to Defendant's Objection:

On September 24, 2019, Omaha Police Officer Jeffrey Vaughn was patrolling near 24th and Leavenworth Street in Omaha, Nebraska. Detective Robert Branch, Jr. Detective Branch contacted Officer Vaughn and told him the Narcotics Unit was investigating Defendant Vance Campbell. Detective Branch told Vaughn that Defendant had recently been observed leaving the garage of an apartment near 24th and Leavenworth Street.

Shortly after his discussion with Detective Branch, Officer Vaughn observed Defendant parked at a gas station. Officer Vaughn parked his cruiser behind Defendant's vehicle and approached Defendant. Officer Vaughn immediately put Defendant in handcuffs and placed him in the front seat of the cruiser. Officer Vaughn conducted a records check and confirmed that Defendant had warrants in Iowa and Sarpy County.

While waiting for the records check, Officer Vaughn walked his K-9 around Defendant's vehicle. Near the front passenger side of the vehicle, the K-9 alerted and indicated the odor of drugs. Officer Vaughn then came back to the cruiser and told Defendant the K-9 indicated to the odor of drugs coming from the vehicle and asked if there would be any reason for that. Defendant responded that he was not sure. Although the audio from the conversation was somewhat muffled, Officer Vaughn then expressed concern that Defendant wanted to "run." Defendant responded that he was not going to run, and told Vaughn there was dope in the vehicle. Officer Vaughn asked about how much dope was in the car and Defendant told him there was half a pound. Officer Vaughn then searched Defendant's vehicle and found approximately 231 grams of methamphetamine in the front driver seat and currency in the center console.

Defendant was taken to Omaha police headquarters where he was interviewed by Detective Branch. Before providing *Miranda* warnings, Detective Branch told Defendant that individuals in Defendant's position could help themselves if they cooperate with police. *See* Hearing Ex. 1; 101 at 3-4. Detective Branch told Defendant that at this point he was not asking questions but just talking. Ex. 1; 101 at 8. Detective Branch told Defendant he was not making any promises or guarantees but explained that cooperating could potentially reduce the amount of prison time Defendant would get. *See* Ex. 1; Ex. 101 at 13.

During this conversation and before any *Miranda* warnings, Defendant asked to call his girlfriend, Rebecca Pick. Detective Branch asked Defendant some questions about Pick, such as her name and where she was located. *See* Ex. 101 at 15. Defendant asked Detective Branch: "Why would you be so concerned about my girlfriend, bro? Trying to use her as leverage against me to get me to cooperate?" Ex. 101 at 16. Branch responded by telling Defendant: "Vance, it's your ass on the line." Ex. 101 at 16. In response, Defendant immediately told Branch "All right. I just want to call my girlfriend, please, then I'll talk to you guys." Ex 101 at 16.

Branch then provided a *Miranda* warning and asked Defendant "knowing your rights in this matter, are you willing to talk to me now?" Ex. 101 at 18. Without answering Detective Branch's questions, Defendant said he had no idea what Detective Branch wanted to talk to him about. Ex. 1; Ex. 101 at 18. Detective Branch again asked, "knowing your rights in this matter, are you willing to talk to me now?" Ex. 1; Ex. 101 at 19. Defendant again did not answer. Detective Branch then told Defendant that sometimes time is of the essence in these situations. Branch also mentioned Pick, stating

3

"hypothetically speaking, okay, sometimes we hit a location, and I know you're concerned about your girlfriend and stuff, when we hit the location, you know, sometimes multiple people get charged with the dope that we find there or whatever we find there." Ex. 1; Ex. 101 at 19. Branch added "I think that's where your concern may lie. You're worried about Rebecca, yeah?" Ex. 101 at 20. Detective Branch continued, "Yeah, I'd be worried about my girlfriend, my wife, you know, whatever it may be." *Id*. Defendant then asked Branch, "What are you saying, what are you asking me?"" Branch answered: "So just because we hit a place, we go somewhere, not everybody gets arrested." Ex. 101 at 20. Defendant asked what place Detective Branch was talking about.

Branch said he did not know and reminded Defendant he was speaking hypothetically. Branch also told Defendant he knew Defendant was not going to smoke the dope he had, that it was going somewhere. In response, Defendant asked Detective Branch what he wanted from him and Detective Branch told Defendant he wanted to get through the last question: "knowing your rights in this matter, are you willing to talk to me now?" Ex. 1; Ex. 101 at 21. Defendant again did not answer the question but said "Talk to you about what?" *Id*. Detective Branch responded: "about drugs." *Id*. Defendant acknowledged that Branch found drugs in Defendant's possession and asked what else Branch wanted to know. Detective Branch responded "if you answer the question, then I'll . . . ." *Id*. Before Branch could finish the question, Defendant said yes, waiving his *Miranda* rights.

Following Defendant's waiver, Branch asked about the location of additional drugs, but Branch also hinted that he knew where the drugs were. Detective Branch explained: "So what if we're in the process of getting those 16 pounds right now? You either want

4

credit for it, you want to be of assistance, or do you want to sit there and say I'll take my chances, good luck to you?" Ex. 1; Ex. 101 at 32. Defendant then provided the general location of some drugs and later asked "What am I gonna get?" Ex. 1; Ex. 101 at 33. Detective Branch responded: "I'm not going sit here and make you any promises or guarantees." *Id.*

Defendant led law enforcement to an abandoned apartment. He explained that although the apartment belonged to a friend, nobody lived there. After arrival at the apartment, Branch gave Defendant an Omaha Police Department Permission to Search Form. Defendant told Branch that he would not take Branch to the location of the drugs without a promise that Defendant would not be charged for possessing them. Branch countered that if Defendant did not give permission, they would obtain a warrant. Branch stated: "It's up to you, all right? Nobody threatening you. And I told you there's a possibility that you may be charged with it. There's a possibility you might not." Ex. 101 at 43-44.

Defendant continued to refuse to give permission to search unless he was promised that he would not be charged. Detective Branch repeatedly told Defendant that there was no guarantee that Defendant would not be charged. However, Defendant eventually provided consent to search and took Branch to the apartment where the drugs were located. Using Defendant's key to access the apartment, Defendant showed law enforcement where the drugs were located throughout the apartment.

Defendant moves to suppress evidence obtained from the traffic stop and subsequent detention, arrest, and search of Defendant's motor vehicle. The Magistrate Judge concluded that, under the totality of the circumstances, law enforcement had reasonable suspicion to stop and detain Defendant, and the search of Defendant's vehicle

5

did not violate the Fourth Amendment. However, the Magistrate Judge concluded that Officer Vaughn should have provided a *Miranda* warning before questioning Defendant in the cruiser and recommended that those statements be suppressed. Neither Defendant nor the government objected to these recommendations.

Defendant also moves to suppress all evidence obtained because of Detective Branch's implicit promises of leniency and the implied threat to arrest Pick absent Defendant's cooperation. Defendant argues that he could not have provided a knowing waiver because Detective Branch's tactics to obtain a *Miranda* waiver were unduly coercive. The Magistrate Judge concluded that, based on the totality of the circumstances, Defendant voluntarily waived his *Miranda* rights before making statements to Detective Branch. Defendant objects to this recommendation.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(C), the Court must make a de novo determination of those portions of the findings and recommendation to which the Defendants have objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendation. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## DISCUSSION

### I. Traffic Stop, Search, and Custodial Interrogation in Cruiser

Defendant did not object to the Magistrate Judge's conclusion that the stop and search of his vehicle did not violate the Fourth Amendment. The government did not object to the Magistrate Judge's conclusion that Defendant's statements in response to Officer Vaughn's custodial interrogation in the cruiser should be suppressed. The Court

6

reviewed the record in this matter, including the hearing transcript, evidence, and the Magistrate Judge's F&R and—with respect to these grounds for suppression—concludes the Motion to Suppress should be granted in part and denied in part, consistent with the recommendation in the F&R.

## II. Coerciveness and Voluntary Waiver of Miranda Rights

Defendant's remaining objection is that his waiver was not voluntary because Branch coerced Defendant to waive his *Miranda* rights. The issue before the Court is whether Defendant's *Miranda* waiver was voluntary. To be valid, "[a] *Miranda* waiver must be made voluntarily, knowingly, and intelligently." *United States v. Parker*, 993 F.3d 595, 603 (8th Cir. 2021) (citing *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008)). The validity of a Miranda waiver is examined under the totality of the circumstances. *United States v. Figueroa-Serrano*, 971 F.3d 806, 814 (8th Cir. 2020), *cert. denied,* No. 20-7528, 2021 WL 2637914 (U.S. June 28, 2021). "The government bears the burden of proving, by a preponderance of the evidence, the validity of a *Miranda* waiver." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986)).

### *A. Knowing, Intelligent Waiver*

To be knowing, a "suspect must waive their rights 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Parker*, 993 F.3d at 603 n.4 (quoting *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011)); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986)). When considering whether a waiver was knowing, the Court may consider Defendant's prior interactions with law enforcement. *See Vinton*, 631 F.3d at 483 (district court could properly consider the defendant's prior interactions with law enforcement to support its finding that the

7

defendant's *Miranda* waiver was knowing, and intelligent); *see also United States v. Adams*, 820 F.3d 317, 323-24 (8th Cir. 2016) (concluding that a suspect's familiarity with *Miranda* warnings supported a knowing waiver). During their conversation, Detective Branch explained why Defendant had been arrested and specifically explained that he would not ask any questions until after Defendant heard and waived his *Miranda* rights. Moreover, Defendant demonstrated that he understood his rights by repeatedly refusing to answer questions until he received assurances about future charges. Defendant's prior experience with the criminal justice system also demonstrates that he knew and understood his rights. The evidence shows Defendant was aware of his *Miranda* rights and the consequences of waiving them, thus his waiver was knowing and intelligent.

### b. Voluntariness of Waiver

Even if Defendant's waiver was knowing, it was not voluntary. To be valid, "the waiver must be voluntary in the sense that 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Vinton*, 631 F.3d at 483). The test for coercion is "whether the defendant's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). Under the totality of the circumstances, Branch's pre-*Miranda* statements about the possibility of Pick's arrest were threatening and coercive. Several courts have determined that threats by law enforcement to arrest a suspect's family member or loved one are coercive if law enforcement lacks probable cause to arrest them. *See, e.g., U.S. v. Finch,* 998 F.2d 349 (6th Cir. 1993) (concluding that information provided to police about the location of drugs was involuntary because it was provided after police threatened to arrest the defendant's mother and girlfriend even though police had no probable cause to arrest them); *U.S. v. Munoz,* 987 F.Supp.2d 438

8

(S.D.N.Y. 2013) (consent to search defendant's apartment involuntary because threats to arrest other occupants, including brother and father, were unsupported by probable cause); *U.S. v. Ortiz,* 943 F.Supp.2d 447 (S.D.N.Y. 2013) (waiver involuntary because threats to arrest defendant's mother and elderly aunt lacked probable cause); *U.S. v. Andrews,* 847 F.Supp.2d 236 (D. Mass. 2012) (waiver involuntary where threat to arrest suspect's elderly, ill mother rendered suspect's confession involuntary unsupported by probable cause); *U.S. v. Guzman,* 724 F.Supp.2d 434 (S.D.N.Y. 2010) (threat that defendant's girlfriend would be arrested unless defendant took responsibility for drugs rendered defendant's consent and subsequent statements involuntary).

For example, in *Munoz*, a felon in possession of a firearm case, police attempted to obtain the defendant's consent to search an apartment that the defendant shared with his father and brother. 987 F.Supp.2d at 447. Police told the defendant that if he failed to consent, police would attempt to get the defendant's father to consent to the search. *Id.* Police then told the defendant that if his father consented to a search of the apartment and police found a weapon, then the occupants of the house could be arrested. *Id.* The court found these statements amounted to threats because they "were designed to, and did, convey the impression that [the defendant's] family members would be arrested if a firearm were found unless [the defendant] consented to the search." *Id.* at 447-48. The court reasoned that using terms such as "could be" and "would be subject to" did not lessen the nature of the threat because the intent of the statements was clear. *Id.* at 448. Most persuasive to the court was the defendant's "emotional reaction" to the police's threat.

9

Branch's statements about Pick implied she would be arrested unless Defendant cooperated and waived his *Miranda* rights. Branch invoked Pick's name at a crucial stage of the interview with Defendant. After struggling for several minutes to even advise Defendant of his rights, Branch finally completed the *Miranda* warnings and asked, "Knowing your rights in this matter, are you willing to talk to me now?" Ex. 101 at 18. Defendant did not respond and instead accused Branch of conducting a spotty investigation. Branch again asked, "Knowing your rights in this matter, are you willing to talk to me now?" Ex. 101 at 19. Again, Defendant did not respond to the question. At that point, Branch said:

> Are -- well, hypothetically speaking, okay, sometimes we hit a location, and I know you're concerned about your girlfriend and stuff, when we hit the location, you know, sometimes multiple people get charged with the dope that we find there or whatever we find there, you know, a gun, whatever it may be, or sometimes people take responsibility for that stuff, and I think that's where your concern may lie. You're worried about Rebecca, yeah?

Ex. 101 at 19-20.

Detective Branch's statements resemble those made by police in the *Munoz* case. As a threshold matter, no evidence suggests that Branch had any probable cause to arrest Pick at the time these statements were made. Further, like the police in *Munoz*, although Branch attempted to couch his statements as a hypothetical, he clearly implied that Pick could be arrested if law enforcement went to a location and found drugs. Branch's next statement that "sometimes people take responsibility for that stuff" either implied that Pick could take responsibility for illegal items found or that Defendant could remove any suspicion of Pick by accepting responsibility for the drugs. Under either interpretation, Branch's intent was clear: Defendant could prevent Pick's arrest by waving his *Miranda* rights and cooperating with law enforcement.

10

Additionally, as with the defendant in *Munoz*, Defendant's emotional reaction demonstrates the coercive nature of Branch's statements about Pick. Branch became aware that mention of Pick's name would cause an emotional response. Before seeking Defendant's waiver, Branch asked about Pick's name and location and saw Defendant quickly deny that Pick knew anything about drugs. Defendant then became agitated and asked "Why would you be so concerned about my girlfriend, bro? Trying to use her as leverage against me to get me to cooperate?" Ex. 101 at 16. Likely remembering this interaction, Branch again mentioned Pick when Defendant would not answer whether he would waive his *Miranda* rights. Branch asked "You're worried about Rebecca, yeah?" and "Yeah, I'd be worried about my girlfriend, my wife, you know, whatever it may be ...." Ex. 101 at 20. Shortly after mentioning Pick, Defendant waived his *Miranda* rights.

Under the totality of the circumstances, Branch's statements that Pick could be arrested unless Defendant cooperated were unduly threatening and coercive. There was no evidence that Branch had probable cause to arrest Pick, and Defendant's emotional response to Branch's statements showed his *Miranda* waiver was the product of threat and coercion rather than a free and deliberate choice. Absent this waiver, Branch would not have obtained Defendant's statements about the location of the apartment, and could not have obtained a valid consent to search the apartment. Accordingly, Defendant's post-*Miranda* statements to Branch and physical evidence obtained from the search of the apartment were the product of an involuntary *Miranda* waiver and must be suppressed.

## CONCLUSION

For the reasons discussed, the Findings and Recommendation will be adopted in part, the Objection will be sustained in part, and the Motion to Suppress will be granted, in part.

IT IS ORDERED:

1. The Findings and Recommendation, Filing No. 86, issued by United States Magistrate Judge Susan M. Bazis, are adopted, in part, consistent with this Memorandum and Order;

2. The Motion to Suppress filed by Defendant Vance Campbell, Filing No. 53, is granted in part and denied in part consistent with this Memorandum and Order; and

3. The Objection to the Findings and Recommendation, Filing No. 89, is sustained consistent with this Memorandum and Order.

Dated this 16th day of July, 2021.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge